# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br>vs.<br><br>VERLYN MELVIN PINDELL,<br><br>                      Defendant. | **FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER**<br><br>Case No. 2:11CR310 DAK |

This matter is before the court on Defendant Verlyn Melvin Pindell's Motion to Suppress. An evidentiary hearing on the motion was held on October 11, 2011. After briefing by the parties, closing arguments were heard on November 17, 2011. At the hearings, Defendant was represented by Mary C. Corporon. The United States was represented by Scott B. Romney. Before oral argument, the court carefully considered all pleadings, memoranda, and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

At all times relevant to this motion, Mr. Pindell was an employee of the Bureau of Land Management ("BLM"), a Division of the Department of Interior ("DOI")of the United States government. In late 2010, Mr. Pindell was being investigated by the DOI for misuse of this BLM work truck. The investigation was led by Special Agent Hyung Suk Ernie Kim ("Agent Kim'"),

a criminal investigator for the DOI. Agent's Kim's investigative responsibilities are split between investigating crimes on BLM land and internal affairs investigations of DOI employees, including BLM employees. Agent Kim's investigation of Mr. Pindell focused on whether Mr. Pindell was driving his BLM truck home during work hours rather than performing his work duties. During his investigation, Agent Kim conducted a surveillance of Mr. Pindell's home and also reviewed records from the GPS tracking device installed on Mr. Pindell's BLM work truck. By March 17, 2011, Agent Kim had completed his investigation, except for his questioning of Mr. Pindell.

Prior to his questioning of Mr. Pindell on March 17, 2011, Agent Kim had determined that the results of his investigation could lead to criminal prosecution of Mr. Pindell. Specifically, Agent Kim testified that, prior to his questioning of Defendant, he had concluded that he would be required to submit the results of his investigation to his superiors or to the U.S. Attorney's Office for criminal prosecution of Mr. Pindell, as made clear by the exchange between Agent Kim and defense counsel:

> Ms. Corporon: But you are a criminal investigator?
>
> Agent Kim: That is correct.
>
> Ms. Corporon: You knew going in on March 17th that there were potential criminal prosecution implications for Mr. Pindell?
>
> Agent Kim: Right.
>
> Ms. Corporon: In fact, at that point you had determined that you would be required to submit this to your superiors or to the U.S. Attorney's Office for consideration of prosecution, correct?

| | | |
|---|---|---|
| | Agent Kim: | Yes. |

Tr. at 21:9-16.

Agent Kim further testified that it was his plan to obtain a statement from Mr. Pindell as part of an "administrative proceeding" within the DOI prior to proceeding with the criminal charges:

| | | |
|---|---|---|
| Ms. Corporon: | | And you didn't share with Mr. Pindell going into this interview that he was a potential target of a criminal prosecution, correct? |
| Agent Kim: | | No. Our intention was to give a Kalkines warning and do an admin action prior to criminal. |

Tr. at 21:17-21.

On March 17, 2011, at approximately 8:30 a.m., Mr. Pindell was escorted from his BLM office to a conference room, by his superior, BLM Field Office Manager, Jill Silvey. At the time Mr. Pindell was escorted to the conference room, he did not know he was under investigation. When he entered the conference room, Agent Kim, Special Agent Rand Stover, and acting BLM State Chief Ranger Cam Stephenson were present. Mr. Stephenson was merely observing the interview and did not ask questions.

At the outset of the interview, Defendant was told, and he acknowledged, that his participation was voluntary and that he was free to leave and to end the interview at anytime. (Tr. at 9, 10, 42, 43). There is no dispute that the tone of the encounter throughout the interview remained conversational and civil. No one raised their voice at Defendant or made any threats against him. Defendant remained alert and responsive throughout the interview, and he did not appear to be under the influence of any drugs or alcohol. Defendant was neither placed under

arrest nor detained against his will. Defendant was not handcuffed at any point during the encounter.

Neither Agent Kim nor Agent Stover informed Mr. Pindell that he was under criminal investigation or that Agent Kim would be submitting the conclusions of his investigation to his superiors or the U.S. Attorney's Office for possible criminal charges.

> Ms. Corporon: At no time during that hour did you tell him [Mr. Pindell] he was potentially subject to criminal prosecution?
>
> Agent Kim: No.

Tr. at 28:23-25

Agent Kim then specifically informed Mr. Pindell that they were "there on a matter of administrative inquiry." Consistent with the representation that Agent Kim was conducting an internal affairs investigation, Agent Kim gave Mr. Pindell the "Kalkines warning" at 8:34 a.m..

As described by Agent Kim, the Kalkines warning informs the employee that the agent is conducting an internal review. Because the review is an administrative matter, the employee is compelled to answer questions about his official duties or risk disciplinary action. *See* Government's Exhibit 1. No information or statements, however, obtained during a Kalkines interview can be used against a suspect in a criminal proceeding, unless the suspect knowingly provides false statements. *Id.* Agents Kim and Stover read Defendant the Kalkines warnings aloud and provided him with a written copy.

The Kalkines warning provided to Mr. Pindell informed him that he was being investigated for improper performance of his official duties, i.e., misuse of his BLM truck

and/or government funds. Consistent with his prior representation that he was conducting just an internal affairs interview, Agent Kim advised Mr. Pindell that the purpose of his questioning was to assist in determining whether "administrative action" was warranted.

As admitted by Agent Kim, within the BLM, "administrative action" is confined to administrative discipline ranging from a verbal warning to termination of employment. Agent Kim's reference to administrative action was consistent with his prior representation that he was conducting a non-criminal internal affairs investigation.

Agent Kim then verbally informed Mr. Pindell that it was Mr. Pindell's official government duty to answer Agent Kim's questions or face possible termination of his employment. Agent Kim further informed Mr. Pindell that, consistent with the Kalkines warning, his statements and any evidence gained from his statements, could not be used against him in a criminal prosecution.

Mr. Pindell then stated that he did not feel comfortable signing the Kalkines warning because "it made it sound like he was compelled to answer the questions and it was not a voluntary thing." Tr. at 45:15-20. Mr. Pindell wanted to voluntarily participate in the interview and did not want to be compelled to answer the agents' questions. Tr. at 13, 45, 51. The Agents then told him that if he did not feel comfortable with the Kalkines warnings, they could proceed under the Garrity warnings which would allow him to participate voluntarily and answer only the questions he wanted to answer. Tr. at 51.

At the evidentiary hearing, Agent Stover explained that the "Garrity warnings have a clause in there that says specifically that the person being interviewed is under no obligation to

5

answer the questions, that they are voluntary and that they are free to go in essence." Tr. at 46:7-10. *See* Government's Exhibit 2. If, however, the suspect voluntarily chooses to answer questions, any information obtained can be used against him in either a criminal or administrative action. *Id.*

While the agents permitted Mr. Pindell to read the Garrity warning, they did not specifically explain the legal significance of signing a Garrity warning versus a Kalkines warning. In this case, the agents specifically told Defendant that the Garrity warnings allowed him the right to participate in the interview voluntarily and that he was free to remain silent and not answer their questions. Tr. at 13, 46, 51. The agents read the Garrity form to Defendant and allowed him time to read it himself. After reviewing the Garrity warnings, Defendant indicated to the agents that he was more comfortable proceeding that way.

Moreover, despite the possibility of criminal prosecution, the document given to Mr. Pindell containing the Garrity warnings was entitled, "Warning and Assurances to Employee Requested to Provide Information on a Voluntary Basis." Mr. Pindell subsequently signed the Garrity warning at 8:34 a.m. Thus, the entire conversation about the Kalkines and Garrity warnings took about four minutes. Thus, between 8:30 a.m. and 8:34 a.m., Defendant was told two contradictory things. First he was told that his statements could not be used against him in a criminal prosecution. When he declined to sign the Kalkines warning because "it made it sound like he was compelled to answer the question," he was then handed a document that stated, among many other things, that his statements could be used against him. This rapid succession of events was undoubtedly highly confusing, particularly when the Agents offered the Garrity

warning as a solution to Mr. Pindell's concern that he wanted to answer the questions voluntarily–and not feel compelled to answer them–while at the same time failing to specifically explain the legal consequences of signing the form.

Having been repeatedly told in the previous few minutes that he was not facing criminal prosecution, it is clear that Mr. Pindell did not understand that he was subjecting himself to criminal prosecution by choosing to sign the Garrity Warning instead of the Kalkines Warning.

Agent Kim and Agent Stover then engaged Mr. Pindell in an interview lasting almost an hour and a half. During this interview, the agents continued to represent to Mr. Pindell that the investigation was administrative for the purpose of determining what "administrative action" BLM would pursue, from oral warnings to termination of his employment. At no time did the agents tell him that he was potentially subject to criminal prosecution.

At the end of the interview, Agent Kim asked Mr. Pindell to provide a written statement as Agent Kim explained, "because I'm going to write an interview or a story, my side of the story, and if he wants to put his side of the story in handwriting he was welcome to do that." Mr. Pindell was then provided a form on which to write his statement. The form provided to Mr. Pindell states that anyone providing a false or fraudulent statement, or who attempts to cover up a crime with his statement, could face prosecution and a fine for his false statement or attempt to cover up a crime. Consistent with the representation that Agent Kim was conducting purely an administrative investigation for purposes of work place discipline, the form provided to Mr. Pindell gave no warning that the statement itself could be used against him in a criminal prosecution.

Defendant provided a written statement to the agents admitting to the misuse of government resources.  *See* Government's Exhibit 3.  After writing his statement, Defendant walked out of the room and resumed his work duties.  The following day, Agent Kim received an email from Defendant apologizing for his conduct and providing additional information about why he had misused government resources.[1]

## CONCLUSIONS OF LAW

Mr. Pindell's statements to Agent Kim and Agent Stover, as well as his subsequent email, must be suppressed as they were obtained through the agents' affirmative deception of Mr. Pindell in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.  When determining the admissibility of a defendant's statements, voluntariness depends upon an assessment of "the totality of all the surrounding circumstances," including "both the characteristics of the defendant and the details of the interrogation."  *United States v. Erekson*, 70 F.3d 1153, 1158 910th Cir. 1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)) .

In determining whether a confession was voluntary "the burden in on the prosecution to prove by a preponderance of the evidence that the challenged confession was voluntary."  *U.S. v. Fountain*, 776 F.2d 878, 886 (10th Cir. 1985); *U.S. v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).  Although the burden remains on the Government to prove voluntariness, if the defendant asserts the confession is the result of police deception, the defendant must produce clear and

---

[1] *See* Government's Exhibit 4.

convincing evidence that the agents affirmatively misled the defendant and that misinformation was material to the decision to confess. *U.S. v. Erekson*, 70 F.3d 1153, 1158 (10th Cir. 1995). Whether a confession is voluntary is evaluated under the totality of circumstances. *Lall*, 607 F.3d at 1285. The Tenth Circuit has explained, in order to prevail on this claim, a defendant

> must produce clear and convincing evidence that the agents affirmatively mislead him as to the true nature of their investigation. Defendant must also prove that the misinformation was material in his decision to speak with the agents. Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.

*United States v. Erekson*, 70 F.3d 1153, 1158 910th Cir. 1995) (quoting *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983) (internal citations omitted)).[2]

"The relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. *U.S. v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996)). Here, Defendant did not freely and rationally make the choice to incriminate himself.

I.      **Mr. Pindell's Statements Were the Product of Deception.**

A confession is not voluntary if it is the product of police deception. *Lall*, 607 F.3d at 1285. *Id*. Misrepresentations of fact are generally not sufficient to render a confession

---

[2] The court recognizes that a confession is not considered coerced or involuntarily made merely because of police trickery and deception, such as misrepresenting the strength of the existing case, that nonexistent witnesses have been found, that the defendant's prints have been found at the crime scene, that an accomplice has confessed and implicated the defendant, etc. *See Clanton v. Cooper*, 129 F.3d 1147, 1158-59 (10th Cir. 1997). These types of factual misrepresentations are not at issue here.

involuntary. *Id*. But misrepresentations of the law, or about the application of the law, that induce a confession, generally render the statement involuntary and inadmissible under the Due Process Clause. *See id.* Similarly, when an officer makes a promise of non-prosecution the officer has,

> . . . made it impossible for the defendant to make a rational choice as to whether to confess – has made it impossible for him to weigh the pros and cons of confessing and go with the balance as it appears at the time. Thus, if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out.

*Id*. at 1286 (citing *U.S. v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).

In this instance, Agent Kim misrepresented to Mr. Pindell the legal consequences of any statements he made during the interview and his subsequent written statements. From the beginning of the interview, Agent Kim represented to Mr. Pindell that his purpose was to conduct an administrative investigation to assist in determining whether administrative action was warranted.

As testified by Agent Kim, both he and Mr. Pindell understood "administrative action" to mean work place discipline, which ranged from a verbal warning to termination of employment. Agent Stover testified that Agent Kim informed Mr. Pindell they were there on a matter of administrative inquiry. This representation was consistent with Agent Kim's role as an internal affairs investigator for the BLM. The representation also served to notify Mr. Pindell that the matter was not a criminal investigation and he was not under the threat of criminal prosecution. In was, however, inconsistent with Agent Kim's prior determination that the results of his

investigation would be submitted to his superiors or to the U.S. Attorney's Office for criminal charges.

When Mr. Pindell refused to sign the Kalkines warning because, according to Agent Stover, "in essence he said that he did not feel comfortable because it [the Kalkines warning] sounded like he was compelled to answer questions and it was not a voluntary thing." Agent Kim immediately produced a second set of warnings which the agents described to Mr. Pindell as allowing him to act voluntarily:

> Ms. Corporon: Now, you didn't tell Mr. Pindell in this interview what you have told the court today about your understanding of the functions of the Kalkines warning versus a Garrity warning, correct?
>
> Agent Stover: We told Mr. Pindell that if he was not comfortable with the Kalkines warning, that there was another warning that we could provide him that did allow for a right to remain silent and had the aspect in there of voluntary answering of questions.

The Garrity warning was provided to Mr. Pindell. It was further represented to Mr Pindell as specifically addressing his concern that his participation in the interview was voluntary and that, in contrast to the Kalkines warning, he could not be disciplined for refusing to answer questions. Very similar in format to the Kalkines warning, the written Garrity warning was provided on a document entitled "Warning and Assurances To Employee Requested to Provide Information On A Voluntary Basis." (Exhibit 2, Garrity Warning.). The document further stated, just like the Kalkines warning, that the interview concerned "misuse of government funds and/or vehicle."

After providing Mr. Pindell the Garrity warning, neither Agent Kim nor Agent Stover

11

notified Mr. Pindell that the interview had suddenly shifted from an "administrative inquiry" to a criminal investigation. (Id. at 28:23-25)

| | |
|---|---|
| Ms. Corporon: | During that period of time, approximately one hour, isn't it true that you laid out for Mr. Pindell what you had done during your investigation? |
| Agent Kim: | Yes. |
| Ms. Corporon: | You laid out for him that you had been conducting surveillance of his residence, correct? |
| Agent Kim: | Yes. |
| Ms. Corporon: | You laid out for him that there was a G.P.S. tracker on his vehicle, correct? |
| Agent Kim: | Yes, that is correct. |
| Ms. Corporon: | And you explained to him that you thought this was a violation of his duties as a B.L.M. employee, correct? |
| Agent Kim: | Correct. |
| Ms. Corporon: | At no time during that hour did you tell him that he was potentially subject to criminal prosecution. |
| Agent Kim: | No. |

Tr. at 28:10-25.

The failure to notify Mr. Pindell of any shift in the focus and purpose of the interview is consistent with the objective at the outset testified by Agent Kim, "Our plan was to give a Kalkines warning and do an admin action prior to criminal." Tr. at 22:17-21. Before conducting the interview, Agent Kim had already concluded that he would be required to submit a report for

12

criminal prosecution and had concluded that his investigation had uncovered sufficient evidence to warrant a criminal prosecution.

The deception was further advanced by the use of the form Mr. Pindell was given to provide a written statement. It failed to warn that any statements he made could be used against him in a criminal prosecution. The form instead only warned that providing a false statement was punishable by a fine and imprisonment. (Exhibit 3, Pindell Statement at p.1).

In general, a confession is involuntary if it is the result of a legal misrepresentation by a law enforcement officer. *Lall*, 607 F.3d at 1286-1287; *see also Hopkins v. Cockrell*, 325 F.3d 579, 584-85 (5th Cir. 2003) (defendant's confession was involuntary where the confession was obtained by a police officer who promised the suspect that their conversation was confidential); *Henry v. Kernan*, 197 F.3d 1021, 1027-1028 (9th Cir. 1999) (police officer's misrepresentation to a defendant that his statements could not be "used against you right now"rendered the defendant's statement involuntary.).

The facts demonstrate that Agent Kim and Agent Stover made misrepresentations to Mr. Pindell regarding the legal consequences of submitting to questioning by the agents and of providing a written statement. The agents affirmatively represented to Mr. Pindell that their investigation was limited to an administrative inquiry, and that the maximum negative impact from his participation in the interview was termination of his employment. Even after providing the Garrity warning, the agents continued their deception by representing to Mr. Pindell that the purpose of the Garrity warning was simply to satisfy his concern created by the Kalkines warning, that his participation in the interview was mandatory and refusal to participate could

13

lead to his termination.  By affirmatively leading Mr. Pindell to believe the investigation was solely an administrative inquiry, the agents stripped Mr. Pindell of his ability to make a free and rational choice.   The agent's conduct prevented him from fully comprehending the consequences of waving his right to remain silent and participating in the interview.  Mr. Pindell's decisions to waive his 5th Amendment rights, to submit to questioning, and ultimately to provide a written statement were the direct result of Agent Kim's and Agent Stover's contradictory and deceptive representations. *See e.g, Hart v. Attorney General of Florida*, 323 F.3d 884, 894 (11th Cir. 2003).

The effectiveness of this deception is made evident by Mr. Pindell's belief that the whole matter was an administrative inquiry regarding job performance and work place discipline.   This belief is evident from the email and attached letter he sent Agent Kim the following day.  In the email Mr. Pindell states, "I am requesting that the attached document become part of the official review file."  Mr. Pindell's identification of the process as a "review" is consistent with Agent Kim's and Agent Stover's representation that purpose was to conduct an administrative inquiry to determine what if any "administrative action" was warranted.  Mr. Pindell further ended his attached letter stating, "I am asking that I have a continued opportunity to work for the Bureau of Land Management an agency that I have great respect for and to make circumstances right that I have wronged." From his statement it is again evident that Mr. Pindell's concern was for his employment and fear that he might be terminated from that employment.  Mr. Pindell's fear is again consistent with Agent Kim's and Agent Stover's representation that there investigation was administrative focusing on work place discipline.

Similarly, the first statement provided by Mr. Pindell focused on his employment and fear of termination. In his statement Mr. Pindell writes, "this job is the life blood of my caring for my family and especially my son. Without the medical insurance and this job my life will be totally destroyed." (Exhibit "B" at p. 1). Clearly, Mr. Pindell's greatest concern was that he would be terminated by the BLM, not that he would be indicted for a crime. Mr. Pindell's focus on the loss of his job rather than criminal prosecution demonstrates that Agent Kim's and Agent Stover's deception regarding the purpose of their investigation left Mr. Pindell without the ability to understand the consequences of providing an incriminating statement and thus the ability to make a free and rational choice.

## II. Pindell's Second Statement Was the Product of Deception and Must Be Suppressed

"The appropriate inquiry in determining the admissibility of [a] . . . second confession is whether the coercion surrounding the first confession had been sufficiently dissipated so as to make the second statement voluntary. The Government must show intervening circumstances which indicate that the second confession was insulated from the effect of all that went on before." *U.S. v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006). In *Lopez*, the defendant made an incriminating statement based on a promise of leniency and then provided a second statement approximately twelve hours later. *Id*. at 1067. The Government argued that the second statement should not be suppressed because it was not the result of the coercion surrounding the first confession. *Id*. at 1066. In ruling to suppress the second statement, the Tenth Circuit concluded that the coercion producing the first confession had not dissipated and there was "no indication that [any police officer] made any statements . . . that might have dissipated the

coercive effects . . . of [the] promise of leniency and the misrepresentation of the evidence." *Id*. at 1066-1067.

As in *Lopez*, between the time Mr. Pindell made his first statement and the time he emailed Agent Kim and Agent Stover, neither agent made any effort to correct their prior deception, leaving Mr. Pindell to believe their inquiry was purely administrative. As noted above, Mr. Pindell's email and attached letter focused not on any potential criminal charges, but on supplementing his official review file and retaining his employment. Because the agents did nothing to correct their prior deception, the coercive effects surrounding Mr. Pindell's first confession had not dissipated and the email and attached letter were products of that agents' prior deception. Accordingly, the email and attached letter must be suppressed.

## CONCLUSION

Based on the above reasoning, IT IS HEREBY ORDERED that Defendant's Motion to Suppress [Docket No. 9] is GRANTED, and Defendant's statements made during the March 17, 2011 interview and his subsequent email and attached letter are SUPPRESSED.

DATED this 19th day of December, 2011.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge